Our third case of the day is Moran v. Calumet City. We'll hear first from Mr. Castiglione. Excuse me. Thank you, your honor. May it please the court. I'm Paul Castiglione and I'm here for plaintiff appellant Nakiya Moran. Nakiya Moran was wrongly convicted of attempted murder in 2009 and was sentenced to 62 years in prison. He served 10 years in prison. The trial judge and state court judge Michelle Pittman subsequently found that defendants in this civil case violated Brady because defendant Lumack never tendered an Illinois state police report stating that the shell casings at issue, the Rossero shell casings, were fired from the same weapon recovered from one Nicholas Chavez. Chavez had similar age and physical characteristics with Nakiya, same height and weight, were in the same street gang, the Latin Dragons. Because of his Brady violation, Judge Pittman granted Nakiya's motion for a new trial and ultimately found him not guilty. Nakiya then filed this civil rights claim and after discovery the district court granted defendants motion for summary judgment. We submit that was errored. This record is replete with questions of material fact on Nakiya's civil Brady claim and other federal and state law claims. With respect to Brady... Can I clarify something with respect to the ballistics report you just mentioned? Are you only appealing the ruling on the Brady claim based on the ballistics report as to Lumack and not the other officers? We are appealing... Well, we are appealing to all defendants. Now is Lumack's position that he never tendered the report to the other officers? That's what he says. The report was in Calumet City's master file. I think that's something a jury would have to determine if the other officers knew. But as to Lumack's testimony, he said no. But what's the evidence... I understand you're appealing it as to Lumack. Right. But what evidence that the other officers were aware of this report or its existence? I didn't see that in your briefs. Yeah, I don't think there is, Your Honor. I think other than the fact it was in the master file and they didn't tender it. Now Lumack says they didn't know about it, but I think it could be inferred as it was in the master file. It's something investigators may have come across or may have known. I think that's something for a jury ultimately to determine. But for certain, Lumack knew about it. He was the one in contact with the Illinois State Police. Now we've cited five, and we used the phrase from the CAM case, baskets of evidence to comprise this one single Brady violation. And when viewed collectively, the different baskets, I believe, show the depth and seriousness of this Brady violation. Now this 2009 criminal conviction was razor thin. There was no confession. There was no physical evidence. Nakia had four alibi witnesses who put him elsewhere. The shooting victim closest to the shooter could not identify Nakia even though he'd known him all his life. Don't we need to look, though, at each of these individual pieces of evidence to see you know whether you've actually gotten as far as showing for civil liability purposes. I'm not one of the things that there are different reasons for different pieces of evidence. So just to take one of them, Yadira's photo array ID of Loera as being at the shooting, certainly exculpatory, but was it withheld? The underlying information seems to have been given to the assistant state's attorney. We dispute that, Your Honor. Well, certainly it was not given to the trial prosecutors. Right, but if it was given to the ASA. Well, the defendant's position was that he told the felony review assistant about it, but there's a couple of things they don't state, and that is the record does not show that any photo arrays were ever tendered to the felony review assistant. That was just, it could very well have just been a And that's from Goody, too. I think that's, you know, better quality of information is what Brady requires. No, the photo array, in fact, on the felony review folder, the photo array box was not checked. I'll also point out, felony review ASAs work with the police when investigating a crime, so we're talking about a point before criminal charges and any obligations for discovery had even began. The prosecutor doesn't dispute, though, that she knew this information, does she? The ASA did not dispute that she knew this information with respect to Yadro's identification. The felony review ASA. Correct. Yeah, but she never got the photo array, and we don't know exactly what was communicated. We think it was just a conversation, Your Honor, but we do know this. But she still knew it. Well, but this is someone who's working with the police during the investigative phase. But isn't the law pretty clear that if the prosecutors know that you can't hold the officers responsible for it, for a Brady violation? I think based on Goody, conversation is one thing, but I think the transmission of more substantive physical evidence. But it's written on the felony review folder. No, the box was not checked, Judge. But it was written that Yadro saw Moran and a guy named Horatio in the alley. That's correct. And the case fact sheet also noted that Yadro saw Lorera in the alley at the scene. That's true, Judge. But again, we stand by our view that that was prior to charges even being brought. The actual report wasn't tendered. And the testimony from the two prosecutors, ASA Coppelson and ASA Lonato, they had no idea. But it's the broader principle that Judge St. Eve just referred to that concerns me about a number of your examples. Not all of them, but the notion that once the prosecutor knows, the police officers are not the people in the 1983 context that you're going to hold responsible for failing to pass this along. Obviously, at the criminal stage, it's the entire prosecutorial apparatus that has the obligation. But for 1983, the prosecutors actually know a fair amount of this. Well, they didn't know about the failure to attend to the arrest card, the Miranda warnings for Bobby Lorera and Amanda Torres. They were two potential suspects. Can I ask you about the Lora and Torres arrest? How does that lead to admissible evidence in Moran's trial? Well, it would be available. It would be jiggly on material, I would submit, Your Honor, in that it would impeach both the investigators and the eyewitness testimony that Nakia was the lone suspect. How does the fact that somebody is a, quote, lone suspect come into evidence? Well, that was certainly the position of the prosecution at trial, that Nakia was the lone suspect here. And I think the way the evidence was presented to the jury was that's exactly the impression I had. But your client's lawyer knew that Lorero and Torres had been arrested and questioned for 26 hours before release. I don't understand how the arrest card and Miranda warnings themselves would be material in light of that knowledge. I think this goes back to Goody, too. They had perhaps secondhand information. They had No, your client's lawyer, defense counsel, Mr. Solani, it's undisputed that he was aware they'd been arrested and questioned for 26 hours. He spoke with them. We don't know what was in those affidavits, Your Honor. But what we do know is that Mr. Solani never got the arrest card and he never got the Miranda sheets. So I think just as in Goody... But what is it on the arrest card itself and the Miranda sheet that would be material given the knowledge that there were other suspects who were arrested and questioned for 26 hours? That's what would be relevant. Well, we don't know exactly what Mr. Solani learned from those other witnesses. And it was secondhand. And to go back to Judge Hamilton's point, that's something I'm not sure they could use, just the affidavits or the testimony... But if you're claiming a Brady violation here, a 1983 Brady violation, you have to show that the information that you're arguing wasn't turned over would be material to the defense. And I haven't seen, and I don't understand, and I'm asking you, what would be material about the arrest card and Miranda warnings themselves given that it was known that they'd been arrested and questioned for 26 hours? The secondhand information that Mr. Solani got couldn't be used, it was hearsay, and it couldn't be used to impeach. But the arrest card could. But it's Brady material... At least as I understand Brady law, it doesn't necessarily have to be admissible as such. It has to be able to lead to the use of material admissible evidence. And you seem to be calling for a requirement of a level of perfection of disclosure to the defense that everything has to be on a silver platter. I wouldn't go so far as to say silver platter, but this was something that was readily available. And that card could have been used just as the videotapes and the documentary evidence and Goody were available to use for impeachment. Your Honor, if I may, could I focus on CST Glumak for a moment? Now, the district court entered some re-judgment, even though he acknowledged, the court acknowledged, I should say, that the failure to remember the ISP report was material, would have been exculpatory, it was clearly a Brady violation. The trial court and state court found that. He finds, doesn't he, in the end that it wasn't willful or intentional, that it was just negligent. He said it was a simple mistake. Right. And in finding that on summary judgment, I think the district court took away that determination from the jury, because state of mind, this court has repeatedly held, is not something that really lends well to summary judgment. Oh, but we've repudiated that statement frequently, too. Well, I could have taken this. And what impact should it have, I'm sorry, Judge, go ahead. What impact should it have that the trial court, in the second retrial where she acquitted your client, found that Glumak's mistake was not intentional, that it was an honest mistake? She thought it was very odd. And I think, does that mistake rise to the level of recklessness? But she said it was an honest, she found it was an honest mistake. It may have been odd, she did find it was a Brady violation, but she specifically found that it wasn't intentional, that it was an honest mistake. What impact on our analysis should that have? I don't think it does, that does, because I think a mistake, if gone too far, and after all, Glumak testified at the 2009 trial. He did not tell the prosecutors about this report. Is that a level, could a jury find that's a reckless conduct to the point where it put, you know, it endangered the violation of Nakia's due process rights? I say it does. So I think that's something a jury ought to be able to decide. But why isn't it just a fact question, whether he's intentionally suppressing it, whether he just forgot it was in the file? I think it is a fact question, and I think the jury should determine it. The honest mistake finding, though, I mean, in terms of deference to the state court findings, it's the same issue, right? You know, I don't know exactly what Judge Pittman meant by, I mean, she may... Well, she was pretty clear, it wasn't intentional. I mean, honest mistake and reckless are not necessarily mutually exclusive. You could have an honest mistake... I'm not sure about that. It depends how bad a mistake something is. This is a pretty bad mistake. Honest mistake certainly does not suggest deliberate... I guess that's true. I guess honest does not. But I think it was a mistake, and I think there's enough circumstantial evidence here for a jury to at least look at it. Should it have any impact that the evidence shows that the assistant state's attorney, when she found this ballistics report after the trial, but while the appeal was pending, sent it over to your client's attorney, and he didn't do anything with it for two and a half years? And did so quite promptly when it comes to her attention. Correct. I don't think so. I think what we're looking at was the Brady violation was in 2009, and that's when the injury took place. Now, my... What about that the appeal was pending, and he could have gone in at that time? To reopen the appeal, or gone back to the trial court to supplement the record? I think that would, again, be a question for the jury in terms of mitigation. I don't think it goes to whatever summary judgment should have been granted. I still think there's a dispute of material fact. So your best Brady claim is the ballistics report? It is. And the district judge found that your theory on summary judgment was flatly contrary to a judicial admission in your complaint. He did. You have attacked his decision not to change that on grounds that don't seem very persuasive to me so far, given that we're talking not about a dismissal on an initial pleading, but a dismissal after full litigation of extensive summary judgment motions and the entry of final judgment after years of litigation. Why was it an abuse of discretion to hold you to the language in your complaint? We do think it was an abuse of discretion. Why? And, okay, we called it a gotcha moment in our brief, and we stand by that. Well, why didn't you... You didn't even, in responding to the summary judgment motion, where the defense was saying we've got you, you didn't even say it then. Right. You were put on notice of it then and didn't do anything. Well, it's certainly in the motion for reconsideration. I think we addressed it more fully. And as to, you know, I think... Well, the standard... The district judge reasonably could have thought that was too late. He could have. If it was really gotcha, you would have expected to pop up at the summary judgment stage. It's hard for me to see an abuse of discretion in a district judge who has decided and closed the case, and you want to say we get to start all over again on a different theory. But we didn't say... No. We did not ask for a different theory. All we wanted to do was amend the complaint so that the complaint would comport to the evidence that came off discovery. We found that after, as Judge Hamilton just said, after years of litigation and ruling on the summary judgment, when you were put on notice of it during the pendency of the summary judgment, that that would be highly prejudicial. I don't think so, Judge, because first of all... Because you would have to start over on that particular issue. No, I don't think so, Your Honor. And the reason I say that is that the party, both sides learned from, you know, it's all just based on a note from Leah Kane from the Illinois State Police. Before you filed your complaint, all this had been aired in state criminal proceedings, right? Correct. All this was known. Correct. And you pled the complaint the way it was pled. Why in the alternative... Why it was not in the alternative, I don't know, but it wasn't. And it's hard for me to see an abuse of discretion in holding you to it. Well, I mean, I think, you know, again, I think the standard is unfair prejudice. I know, I see my time is up. May I finish? Please. Well, you know, in terms of Rule 15a, I recited the Areola case to this court, where after 30 months, a complaint was allowed... A plaintiff was allowed to amend to add a class action, new defendants. You don't have anything there. And it hadn't gone to summary judgment. Well, that's... That's correct, Judge. That's a significant effect. And that's what abuse of discretion means. It means, you know, you might say yes, but you might say no, and either one is okay. Well, it had gone to summary judgment. These were not facts that weren't known to both sides. The plaintiffs learned about... Then why didn't you seek to amend your complaint earlier? We... Your Honor, we should have sought to amend the complaint earlier. It's true. But this was not something that wasn't known. The amendment would not have led to any more depositions, it wouldn't have led to any new claims or any new defendants. If the amendment in Areola was allowable, I think this one... Remind me, was Areola... Did we approve of allowing the amendment, or did we reverse the denial? Ultimately, you affirmed the denial of class certification based on Article III grounds. But in the opinion, the court went through all the different arguments, and one of them was Rule 15. No, I'm... And what had the district court judge done in that case on the amendment issue? I'm trying to remember now. The district court judge, I think, allowed the amendment, as a matter of fact. Right. Okay. Can I add one more thing here? I know I'm out of time, but I'm trusting... One thought, and I'll give the defense some extra time as well. We also cited your concurring and partial concurrence and dissent from the Kessler case, Your Honor, talking about giving... If we're going to have this regime with Iqbal and Trombley and Rule 8... Yeah, that's right at the outset of a case. None of those principles have any application when you've been in litigation for years and have gone through litigation on summary judgment to the merits and the entry of final judgment. I took it to mean that there actually be some leeway on the other end with Rule 15 if we're going to ask for more detail up front from a plaintiff, and an honest mistake is made here in terms of an allegation based on the... Then you fix it. To fix it, yeah, exactly. Before the case is done. Okay. I think we have your points, Mr. Castaglione. Thank you, Your Honor. Let's see. Ms. Ranum for the defendants. Are you speaking for all the defendants? Yes. Good morning, Your Honors. May it please the court. My name is Laura Ranum, and I represent the defendants in this matter. Your Honors, this case is a prime illustration of this court's principle from Coleman v. City of Peoria that a vacated conviction does not always establish civil liability. It is true that this case involves a Brady allegation that a ballistics report was suppressed from plaintiff and that plaintiff's post-conviction petition was granted as a result. But the question before this court is whether defendant Glumak intentionally concealed that report and suppressed it from plaintiff before his 2009 criminal trial. So explain to me why the finding or why the assumption that Glumak was merely negligent or making an honest mistake versus intentionally trying to sweep something under the rug. Why isn't that a factual issue that requires more development? Sure, Your Honor. So in this case, the record is clear that defendant Glumak was aware that the report was going to be disseminated to the state's attorney's office by the state police. So under those circumstances where defendant Glumak has no reason to believe that he even has the power to conceal the report, he's in contact with Leah Kane. He actually provides Leah Kane with A.S.A. Copleson's name. He also approves Leah Kane disseminating the report to two other law enforcement agencies. And he knows that A.S.A. Copleson has access to the report through the computer system, the CALM system. So under those circumstances where an individual has no reason to believe that his actions will be of any consequence, his failure to internally circulate that report at the PD can't be found to be anything other than negligent because he had no reason to believe it would be of any consequence to Nakia Moran. Now, this has always been plaintiff's primary claim in this lawsuit. And in the briefs, he only asks that summary judgment be reversed with regard to defendant Glumak. And that includes in reply after defendants clarified in response that that was our understanding. And in reply in footnote six, he again said it was of no consequence whether he was only asserting it against defendant Glumak or asserting it against the officers. I'm not sure what to make of plaintiff's arguments today, but the argument with regards to defendants Grau and Rapaz has certainly been forfeited. There doesn't seem to be any evidence that the other two officers  Is that correct? That's correct, Your Honor. There is no evidence. They both testified in their depositions that they were unaware of the report. But I thought there were other aspects of the case that did implicate the other officers. There are. Beyond the ballistics report, he has a whole list of things that he claims were all Brady material. They were exculpatory. They were withheld. They were material. Now, maybe some of them weren't withheld or maybe some of them weren't material or what have you. But he does have quite a few other things, some of which are the responsibility of the other officers. That is correct, Your Honor. And I apologize if I wasn't clear. My point is just that with regards to the ballistics evidence, a plaintiff has only argued that summary judgment should be reversed with regards to defendant Glumak. But there are four other Brady allegations made against the investigating officers. Before we move off of the ballistics report, from your standpoint, what impact should the state court judge who retried the case and acquitted the plaintiff here, her finding about Glumak, what impact should that have on our analysis? Is that just another piece that's a question of fact for the jury? Is that something we should give deference to? It's not a 2254 or 2255. What impact should that have? Well, I think it certainly is compelling evidence that he did simply make a mistake. Do you really want to go there? They've been arguing collateral estoppel issue preclusion based on the findings of that court. I think that's incorrect with respect to your officers. But I don't see how you get to pick and choose among the findings of the state court. We are certainly not arguing that this court or anyone would be stopped from revisiting the intent issue. And what I was actually going to say, just to begin with collateral estoppel, collateral estoppel was never raised in this case until plaintiffs replied to his rule 59 motion. It was relegated to a footnote in his brief report. It's not an issue. Okay, your honor. But regardless, what is truly dispositive on the intent issue is what I was describing to Judge Wood, which is that defendant Glumak was actually actively facilitating the dissemination of this report.  to provide it to the state's attorney's office. Under those circumstances, he simply made a mistake. How does that address his testimony at the trial? Did he know then that the prosecuting attorneys didn't have it and the defense didn't have it? He testified in this case that he was not aware. So he was brought in to testify at trial about the crime scene, which was his only role in this case was that he processed the crime scene on the night of the shooting. He brought the physical evidence to court. That's what he was asked to do. He was unaware that the prosecutor hadn't received the report because again, he presumed that the state police had followed through on their obligation of providing the report to A.S.A. Coppelson. So does he have a duty at all as an individual to make sure that that report gets to the prosecutor? What defendant Glumak has testified to he never would have directly sent that report to the prosecutor anyways. It was his job to circulate it to the investigators. Okay, but he didn't do it. But in his testimony, he did not do it. What I'm concerned about here, we're not talking about the criminal case where we look at the state in essence as an entity, but I'm very concerned about police officers saying, I thought you were doing it. And that's what this starts to look like. Well, I think that's a fair question, Your Honor. But it wasn't defendant Glumak who even had an obligation to directly provide it. What was his obligation? Well, certainly under Section 1983 liability, there has to be this level of intent. But under state law, what was his obligation? Or just office routine. Office policy. Yeah. What's he supposed to do when he gets in a relevant ballistics report about a case of his? He was supposed to circulate it to the officers. He was supposed to look up who the officers were on the case, circulate it to them. And then it was supposed to end up in the PD's records file, which presumably then would have been how it would have gotten to the state's attorney's office when those records were requested. So his obligation was just to send it to the other officers, not to send it over to the state's attorney? It wasn't his role to directly send it to the state's attorney's office. Now, I'm not saying that in a situation where if he had received the only copy of the report, that he wouldn't have some obligation to make sure exculpatory evidence ended up with the state's attorney's office. I'm just saying that his role was to circulate it internally. And that was how the PD dealt with that obligation. But under these circumstances, Section 1983 requires a requisite level of intent. And you simply cannot get there. When you have an officer, he is facilitating the dissemination of this report. He's approving it, going to other agencies. He's providing ASA Copleson's name. He simply made a mistake. And under those circumstances, When you say made a mistake, though, it sounds like he did have an obligation to make sure it showed up in ASA Copleson's email or however it's done there, instead of just putting some names at the top of the report and assuming that inertia will cause it to wind up in the right files. Well, and I don't mean he wasn't assuming anything. His normal practice would have been to circulate the report. But in this instance, where he- How does he circulate it, then? Does he put it in envelopes? And is it walked around? Or does he email people? Or what does he do? I believe what he said in his deposition was he would provide it to the investigators. And I can't remember if he said that there was a- and I don't remember fully how he said that. I think he said there was a mail slot he was supposed to put it in. But I don't remember with certainty. But he was supposed to get it to the investigating officers. And that was his job within the PD, was to circulate that report. But again, he inadvertently didn't circulate that report to the investigators. But he is still operating with the understanding that the prosecutors are going to receive it from Leah Kane. And I would like to address plaintiff's judicial admissions. Now, plaintiff throughout his briefing  He's trying to downplay the gravity and the sweeping nature of the admissions that he made in that complaint. This isn't about paragraph 56. It's seven separate admissions in that complaint where he advances an entire theory that A.S.A. Copleson had the evidence, suppressed the evidence, and then lied about it during the post-conviction, including as an officer of the court, perjuring herself at the post-conviction. That- talk about unequivocal judicial admissions. We couldn't even find a case that came close to analogous to the admissions that occurred here. And this Seventh Circuit case law couldn't be clearer that judicial admissions trump evidence. And plaintiff doesn't even dispute that. He simply says, I should get a do-over. The district court abused his discretion by denying my Rule 59 motion to come back in after you enter judgment and amend the complaint. And he keeps focusing on prejudice. Now the district court, in response to this audacious request, didn't even do what he could have done. He could have applied the Rule 59 standard, but he didn't. He applied the more liberal Rule 15 standard. And to no one's surprise, he still found unexplained delay, prejudice to the defendants, and futility. And there was discussion, even last night in a 28-J letter that was filed with this court yesterday evening, about prejudice. And plaintiff misrepresents in that letter that the burden was on defendants to show the prejudice. That flies in the face of the precedent of this court. King v. Cook said, the prejudice is on the moving party to demonstrate the absence of prejudice to the non-moving party. And there certainly is prejudice here. And I would just like to touch briefly on two forms of prejudice that occurred here. The first is the obvious expenditure of resources. We've spent five years litigating this case all the way through to its conclusion, with me now standing before you today. And now plaintiff would like to go back down to the district court, and defendants will have to start summary judgment all over again. There's also the discovery that we chose to forego, because the record is clear. It's undisputed. A.S.A. Copleson should have received this report from four different avenues. She should have received this evidence from A.S.A. Brian Holmes in the gang unit, who received a case-to-case association. She should have received this report from Leah Kane, who we know was actively trying to get in touch with her to get her the report. She should have received it from the PD. And she had access to it through the computer system. So if it hadn't been for the admissions, defendants would have gone to even greater lengths to continue to develop the idea that A.S.A. Copleson did in fact receive the report. Because the idea that there's four highways, all intended to make sure that this evidence gets to one person, and that all four of those highways collapsed, and this report somehow went missing before Mr. Moran's trial, is extremely unlikely. So in this, let's assume for the moment though, that she was telling the truth, that she never got that, okay? I think we have to assume that for these purposes. Is each of the highways that you're talking about, the people who are responsible for each of those channels to her, is each entitled to say, not my fault because of the other three? Well, I would just like to say first of all, that there's a separate issue that we raised in the briefs. The district court didn't reach it. A.S.A. Holmes did receive the report. And that in and of itself is a challenge. I understand your argument about that. And we also know that Cook County State's Attorney's Office is enormous, and I don't know what the legal implications of that are for civil liability. But go back to the question I asked you. For purposes of civil liability, is each person manning each of those highway toll booths or whatever entitled to say, whatever happened, it's not my fault because of the other three highways? No, I wouldn't go that far, Your Honor. I think you have to look at causation, which plays into certain aspects of that highway. And then you have to look at qualified immunity. So to your point, Your Honor, about Cook County State's Attorney's Office is a big office. Under Giglio, which was decided in 1972, the Supreme Court specifically contemplated, we understand there's large prosecutor's offices, but they have to put procedures in place to make sure that this evidence and information is transmitted to where it needs to go. And that's exactly what A.S.A. Holmes had done. He had a process for when these case-to-case associations would come in. His secretary, she would look up the number, she would route the information to where it needed to go. And so that's one of the areas that we would have done more discovery on. We would have deposed the secretary and the other people in the gang unit. But to answer your question under Giglio, which these are the principles that are guiding police officers under qualified immunity when they're conducting their criminal investigations, Defendant Glumak would have no reason to know he was violating a clearly established right under those circumstances. Well, actually, I'm not so sure about that because with qualified immunity, it doesn't have to be clearly established that you're liable. It has to be clearly established that what you're doing is violating the rights, okay? And he does seem to have an obligation to get that information on its way. The fact that other people may also have that obligation, I'm not sure how that's really a defense. Well, Your Honor, in a situation where the state's attorney's office has the evidence, which ASA Holmes' office did have the evidence, a police officer at a minimum qualified immunity cannot be held liable for not also providing that evidence. And this is something that was addressed in the Porter v. White case, which- That's the 11th Circuit case. It is an 11th Circuit case, which we cited in our briefs, which specifically says that when you're looking at Section 1983 liability, you need to look at whether the prosecutor not only didn't receive the information from that individual, but didn't receive it from any other source. And I would, if the court would just allow me- I allow Mr. Castiglione a little extra time, and I want you to make sure you're fully heard. Thank you, Your Honor. I would like to briefly address the fabrication claim. Now, on the fabrication claim, the fabrication claim relates to an on-scene identification that was documented in a police report in May 2008, saying that in addition to the several other identifications that Yadira made, she also identified Nikia Moran at the scene of the crime. And the district court in dismissing that claim relied on Coleman v. City of Peoria and said that it was immaterial. There's no way it could have impacted the judgment of the jury for a couple reasons. One, Yadira actually denied at the trial that she identified plaintiff on the scene. She said the first time she identified him was at the hospital. And then number two, just like in the Coleman case, both she and her brother Eduardo made unwavering identifications in court. The jury heard in-court identifications. They heard about her identifying him in the photo array, and she said she was 100% certain,  and by the way, the report itself was not admitted at trial, but there were oblique references made to an on-scene identification. They never actually said it was Yadira. There was actually an on-scene identification from Eduardo, but regardless, those oblique references couldn't possibly have affected the judgment of the jury when you have an individual making an unwavering identification who also says, I didn't actually identify him at the scene. And we have been citing Coleman and saying that Coleman is on all fours with this case since the original summary judgment briefing. We did again in the Rule 59 motion, we've called plaintiff out several times for refusing to even acknowledge the case. He continues- I think we have your views. Okay. Thank you, Your Honor. And for the reasons we've discussed today and for all the reasons set forth in our brief, we ask that the district court be affirmed. Thank you. Okay. Thank you very much, counsel. Mr. Castiglione, two minutes of rebuttal. Well, Your Honor, first of all, ASA Brian Holmes and the gangs unit never received the ISP report. They received a document called the ISP hit sheet, which has different information on different cases. Didn't have the Moran case, didn't have the number, didn't have anything. So it's totally irrelevant. Judge Hamilton, you asked about CST Blumach and his duties. He got a subpoena. In fact, he got a subpoena from both sides, both from the state's attorney's office and from the defense, asking him to bring all documents. And this ISP report was in the master file. So he didn't bring it. So I think that shows right that he had a subpoena. He didn't bring it. Not bringing it violated Brady. And the only question really now is, did he engage in the proper sufficient state of mind to establish civil Brady liability? Judge, I need to go back to a couple of your questions. Solani did not know that Loera and Torres were arrested based on probable cause. He didn't know that. And he did not know if they were in custody for 26 hours. So I think those are both material. Facts that would have been helpful if they'd had the paperwork, which we feel they should have had. As to the standards on Rule 15A, we did cite St. Anthony and the recent Woods case. And I think we cited them properly. I think there has to be some showing of unfair prejudice. And I dispute the council's claim of prejudice here. Yes, they expended resources, but it's not as though it became a surprise at the last minute that ASA Coppelson never received the ISP report or the other things we mentioned. That's something that has been known through all the depositions. And I might point out, Brian Holmes, deposed. Leah Kane, deposed. Cordelia Coppelson, deposed. ASA Linnott, deposed. So this idea that they have to go back and do more stuff, I don't know what else they would have done other than what they already did. And to sum up, Nicky and Moran went to prison basically because his criminal trial did not comply with due process. We simply ask here to be given an opportunity to go before a jury and show that that was done either recklessly or intentionally. We ask the court to reverse the decision. Thank you, Your Honor. Thanks to both counsel. The case is taken under advisement.